ATCHISON, T. & S. F. RY. CO. v. HAMBLE.

(Circuit Court of Appeals, Ninth Circuit. March 9, 1910.)

No. 1,730.

1. RAILROADS (§ 261*)—ACCIDENTS TO TRAINS—INJURIES—PERSONS LIABLE—TRAFFIC AGREEMENT.

That defendant operated trains over the S. Company's tracks under a joint track agreement by which the latter retained full control of the movement of all trains over the track, and defendant's employés were required to take an examination for fitness before going on the same before an officer of the S. Company, which reserved the right to bar any of defendant's employés from working on or over the track, did not relieve defendant from liability for the negligence of its servants in operating trains on such joint track, resulting in a collision and injuries to a servant of the S. Company.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 824–830; Dec. Dig. § 261.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**2. Railroads (§ 261\*)—Accidents to Trains—Injuries—Persons Liable—Negligence.**

Where defendant was required to move its train from station to station on the track of the S. Company, under orders of the latter's train dispatcher, defendant would not be liable for injuries resulting from the negligence of the dispatcher; but, if a collision occurred, not attributable to the dispatcher's orders, but to the negligence of defendant's employés, defendant's liability would attach.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 824-830; Dec. Dig. § 261.\*]

**3. Railroads (§ 273\*)—Accidents to Trains—Injuries—Negligence—Proximate Cause—Questions for Jury.**

Where defendant operated a train in charge of its own conductor over the tracks of the S. Company, under a contract for joint use, and a collision occurred due to the negligence of the S. Company's engineer in running the train at high speed past a block signal set against him, and defendant's conductor also testified that he could have seen the block signal so set if he had been paying attention, and also fusees on the track to protect the preceding train, and could have stopped his train by opening the conductor's safety valve in the caboose, but he failed to do so, and a collision occurred resulting in injury to the conductor of the preceding train, in the employ of the S. Company, whether defendant's employés were negligent, and whether such negligence was the proximate cause of the collision, were for the jury.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 273.\*]

**4. Trial (§ 257\*)—Instructions—Requests—Time.**

Under Rev. St. § 918 (U. S. Comp. St. 1901, p. 685), authorizing the Circuit Court to make such rules regulating its practice as may be necessary or convenient for the advancement of justice, and the prevention of delays in proceedings, it was proper for the court to refuse to consider requests to charge not presented before argument, according to a rule requiring them to be presented at the close of the evidence and before argument.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 642-645; Dec. Dig. § 257.\*]

In Error to the Circuit Court of the United States for the Southern Division of the Southern District of California.

Action by Mark B. Hamble against the Atchison, Topeka & Santa Fé Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed.

This was an action brought by the defendant in error, hereafter designated as the "plaintiff," to recover damages from the plaintiff in error, hereafter designated as "defendant," for personal injuries resulting from the defendant's alleged negligence.

That part of the Southern Pacific line of railway in Southern California between Mojave and Bakersfield, a distance of about 69 miles, although a single track, is occupied jointly by the Southern Pacific Company and the defendant, the Atchison, Topeka & Sante Fé Company; the latter having a license to run its trains over this section of the Southern Pacific track. Intermediate between Mojave and Bakersfield are the stations of Tehachapi and Bealville. The track from Tehachapi near the summit of the Tehachapi Mountains to Bealville is downgrade; the average descent being about 120 feet to the mile. The line of road between these two points passes over a number of curves and through a series of 14 tunnels. To guard against collisions, the road is divided into sections of varying lengths, called "blocks," and these blocks are equipped with an effective system of automatic block signals. These signals are described by the attorney for the defendant as follows: "At the initial end, or entrance, of each block, and at the right side—

the engineer's side—is a block signal consisting of a post having near its top
an arm, or semaphore, pivoted near one of its ends on the post, so that it
can be swung freely through an arc of 90 degrees in a plane at right angles
with the block. The long end of the arm is painted red on the side visible to
a train approaching the block to enter. The short end of the arm is provided
with a red, a green, and sometimes a yellow round disc of glass, arranged in
the arc of a circle, so that, as the arm is moved to given angles with the post,
these colored glasses will severally stand opposite a light fixed near the head
of the post, and will show a red, green, or yellow light to the train approach-
ing the block entrance. Adjacent to the post is an electromagnetic mechanism
which swings the semaphore to the desired angle, and is in an electric cur-
rent formed by the rails in the block and the wheels of a locomotive or car
in contact with both rails. When there is no train on the block, the sema-
phore is at an angle of 45 degrees with the post, and the green light shows.
When the forward wheels of the pony truck of a locomotive pass onto the
ends of the rails at the block entrance, the semaphore swings up and stands
at right angles with the post, its long arm extending away from the track,
that is to the right as the train is going and the red glass in the short arm
confronts the lamp. The semaphore remains in this position until the last
two wheels of the last car in the train pass off of the end of the rails at the
block terminus, when it drops again to an angle of about 45 degrees and
shows the green light. By day the red arm at right angles, by night the red
light, is a signal to enter the block, because it is clear."

The section of road with which we are immediately concerned in this case
is a single block having a length of about a mile and a half extending above
Bealville. The track in this block passes through four tunnels and over about
the same number of curves. The lower tunnel is numbered 3, and is located
above Bealville. The next above is numbered 4, the next above that is num-
bered 5, and the upper tunnel is numbered 6. At the upper end of this block
at a point 1,400 feet above the upper end of tunnel No. 6 stands the upper
block signal for this block, which gives information to a train coming down
the mountain of the condition of the track throughout the entire block below.
The lower block signal is below tunnel No. 3 in Bealville. There is also a
cautionary signal about 200 or 250 feet above tunnel No. 4. This cautionary
signal gives information to a train coming through the block as to the condi-
tion of the track approaching the station at Bealville, about 1,500 feet below
the lower end of tunnel No. 4.

The movement of trains over this section is under the direction of the divi-
sion superintendent of the Southern Pacific Company at Bakersfield, who
gives his orders through the train dispatcher at that place. Practically the
orders of the division superintendent are in fact issued by the train dis-
patcher.

The plaintiff on February 2, 1903, was employed as a conductor on an extra
freight train No. 2,602, belonging to the Southern Pacific Company, consisting
of 35 empty freight cars with an engine in front and a caboose, or way car,
at the rear. This train left Tehachapi about 2 o'clock on the morning of Feb-
ruary 2, 1903, and arrived at a point near the switch at Bealville about 6:05
a. m. The train was stopped and held at this point because the track was
blocked by another train in front of Bealville. The train had passed through
tunnel No. 5 and partly through tunnel No. 4. The rear end of the train, in-
cluding the caboose, stood in the westerly end of tunnel No. 4. This tunnel is
257 feet long. The train stood about 90 feet in the westerly end of the tunnel,
leaving about 167 feet of the easterly end of the tunnel clear. The distance
between tunnels 5 and 4 is about 2,564 feet. The track between these two
points is plainly visible from the westerly end of tunnel No. 5, except at a
point from 100 to 150 feet from the westerly end of tunnel No. 5, where the
track passes through a cut or curve for a distance of about 200 or 300 feet.
The evidence that the block signal system was in full operation on that morn-
ing is uncontradicted. When plaintiff's train came to a standstill in and
below tunnel No. 4, the rear brakeman on that train went back up the track
between tunnel No. 4 and tunnel No. 5 and struck a lighted fusee on a tie and
placed two torpedoes on the rail to protect the train from collision from an
overtaking train. This brakeman testified that when he saw the fusee was
burning out he went back to the caboose and got another fusee and two ad-

ditional torpedoes. Returning up the track, he placed the second fusee and the two additional torpedoes at intervals along the track. He then heard a whistle which he thought came from the engine of his train calling him in. Upon going back he found his train still standing in the tunnel. Returning up the track he saw a headlight coming out of tunnel No. 5. This headlight was the headlight of the following train, consisting of three engines and caboose, which had left Tehachapi shortly after plaintiff's train. This train, when seen by the brakeman, had passed the block signal above tunnel No. 6 showing red, and warning this train that there was another train in the block. It passed down the track between tunnels Nos. 5 and 4, exploding the torpedoes and passing over the burning fusee set by the brakeman. It passed the cautionary signal above tunnel No. 4 showing yellow, warning the train to come to a stop, and proceeding onward entered tunnel No. 4, where it smashed into the rear of plaintiff's train, driving that train with 10 brakes set a car length ahead, smashing a caboose, and driving an oil car up into the roof of the tunnel. The plaintiff was in the caboose at the time of the collision and was carried forward in the wreckage and rendered unconscious. When he regained consciousness, he found himself on the top of a door on a level with the mouth of the tunnel and in the midst of wreckage. He crawled out on an oil car and from there to the ground. His left leg was so badly crushed that it became necessary to amputate it below the knee. From that and other injuries received at the time he was in the hospital for a greater part of two years.

At the summit that morning two engines and a caboose belonging to the defendant were coupled together as a train. The engines were numbered 781 and 784: No. 781 being in the lead. The train dispatcher issued an order that these two engines and caboose should go down the road as a train to Kern Junction near Bakersfield as extra No. 781. Under the rules of practice of the road relating to the movement of trains, the leading engine holds the orders of the train dispatcher, and the train, when an extra, takes its number from the number of the engine. After this train had been made up in the order stated, with a conductor in the employ of the defendant in charge, the train dispatcher issued a supplemental order, which was delivered to the conductor and to the engineer in charge of engine No. 781, to couple to engine No. 2245, belonging to the Southern Pacific Company, and to take it to Kern Junction. To avoid the delay in switching, this last engine was placed at the head of the train. The number of the train was not, however, changed, but retained its number as extra No. 781. This train as thus made up had an engineer in the lead in the employ of the Southern Pacific Company, two engineers in the second and third engines, respectively, and a conductor and brakeman in the caboose in the employ of the defendant. Precisely when this train left the station at Tehachapi near the summit is not clear; but, as there is no controversy on that point, it is sufficient to say that it followed plaintiff's train down the mountain, and it will be assumed that it left Tehachapi after a proper interval. It was this following train that overtook and smashed into plaintiff's train in tunnel No. 4 near Bealville, where plaintiff received his injuries.

Thereafter plaintiff brought this action, alleging that by reason of the negligence of the defendant, its servants, agents, and employés, the engineers of said two locomotive engines and conductor in charge of said train and said caboose, said train was caused to come into violent collision with the caboose at the rear end of the train of which plaintiff had charge and in which he was stationed, whereby he was injured.

The defendant in its answer alleged that in the year 1899 the Southern Pacific Company had granted to the defendant a license or privilege authorizing the defendant to run and operate engines, cars, and trains over said line of railway between Mojave and Bakersfield upon condition that the operation and movement of all such engines, cars, and trains to be operated over said line of railway by the defendant should be subject to the immediate direction, government, and superintendence of said Southern Pacific Company through its agents, and that since the year 1899 defendant had been engaged in running and operating certain of its cars, engines, and trains over said line of railway in pursuance of said license, privilege, and arrangement, and not otherwise. Defendant admitted that the train referred to in the complaint as

having collided with the train in charge of the plaintiff consisted of three steam engines coupled together and drawing a caboose, or way car, and admitted that the whole of said train excepting the forward locomotive was owned by the defendant; alleged that the forward locomotive was owned and in the possession of the Southern Pacific Company, and was at the time of the collision controlled, operated, and directed solely by the last-named company and its agents and servants; and that the train while running over said line of railway upon said occasion was under the sole direction, control, and government of the Southern Pacific Company and its agents; and denied that the collision or injuries suffered on that occasion were in any manner caused by any negligence on the part of the defendant or any or either of its servants, agents, employés, engineers, or conductors; charged that the plaintiff was guilty of carelessness, negligence, and a failure to exercise ordinary care in respect to properly guarding and protecting the train in his charge against the danger of collision with other cars, engines, and trains being operated over said line of railway at that time, and that such negligence, carelessness, and a failure to exercise ordinary care on the part of the plaintiff was the proximate cause of such collision and each and all of the injuries sustained by the plaintiff on such occasion.

Upon a trial of the case before a jury, at the conclusion of the evidence for the plaintiff the defendant moved for a nonsuit on the grounds: First, that the train of engines and caboose and everybody on it from the time the train left the summit until the collision was under the control and direction of the Southern Pacific Company and not of the defendant; and, second, on the ground that no negligence had been shown on the part of the defendant. The court granted the motion on the first ground and entered a judgment in favor of the defendant. The case was brought to this court by the plaintiff upon a writ of error, and the judgment reversed and remanded for a new trial. Hamble v. Atchison, T. & S. F. Ry. Co., 164 Fed. 410, 92 C. C. A. 147, 22 L. R. A. (N. S.) 323. In the opinion of this court it was held that the defendant running a train over the track of the Southern Pacific Company under a contract that they would obey the orders of the train dispatcher of the Southern Pacific Company did not relieve the defendant from liability for injuries to the plaintiff caused by the negligence of its employés operating the train and which was in no way attributable to an order of the train dispatcher. The court further held that the liability of the defendant was not affected by the fact that one of the engines attached to the train belonged to the Southern Pacific Company; that, notwithstanding the presence of this engine, the train remained in the control of the conductor, an employé of the defendant, and it was by reason of his negligence the collision occurred. Upon the second trial the evidence on the part of the plaintiff was substantially the same as at the first trial.

On the part of the defendant, in addition to other evidence, a stipulation was introduced in evidence that certain witnesses, if present, would testify that:

Under the agreement by which this track was jointly used by the Southern Pacific and defendant, the Southern Pacific Company had sole control of the movement of trains on the said track; that the employés of the defendant were required to take an examination for fitness before going upon the same by an officer of the Southern Pacific Company, and that the Southern Pacific Company reserved in said agreement the right at any time to bar either temporarily or permanently any employé of the defendant from working at all upon or over said track.

It was agreed that the word "movement," as used in the first part of this stipulation, meant "movement of trains under the orders of the train dispatcher."

The court instructed the jury, among other things, that the conductor and other employés of the defendant on the train which collided with the Southern Pacific train of which plaintiff was conductor were defendant's servants, and that their negligence, if they were negligent, was the negligence of the defendant. In connection with this instruction, the court read that part of the opinion of this court in the former case upon that question. To this and to other portions of the instructions given by the court exceptions were taken by

the defendant. It also excepted to the refusal of the court to give certain requested instructions and to the admission and rejection of certain testimony. The jury returned a verdict for the plaintiff. The case is here upon a writ of error sued out by the defendant.

E. W. Camp, A. H. Van Cott, and U. T. Clotfelter, for plaintiff in error.

Glen Behymer, Mattison B. Jones, and William Freeman, for defendant in error.

Before GILBERT and MORROW, Circuit Judges, and HUNT, District Judge.

MORROW, Circuit Judge (after stating the facts as above). We find nothing in the testimony on the second trial of this case calling for any change or modification of the opinion of this court upon the former writ of error. Nor do we find that the evidence calls for the application of any other or different rule of liability than there announced. Hamble v. Atchison, T. & S. F. Ry. Co., 164 Fed. 410, 92 C. C. A. 147, 22 L. R. A. (N. S.) 323. The fact that the Southern Pacific Company under the joint-track agreement retained full control of the movement of trains over the joint track, that the employés of the defendant were required to take an examination for fitness before going upon the same by an officer of the Southern Pacific Company, and that the Southern Pacific Company reserved in said agreement the right at any time to bar either temporarily or permanently any employé of the defendant from working upon or over said track, did not relieve the defendant from liability for the negligence of its servants in running trains over this track. The defendant was required to move its train from station to station on this track under the orders of the Southern Pacific train dispatcher, and if by reason of such orders a collision should occur between the defendant's train and another, attributable to the negligence of the train dispatcher, the defendant would not be liable for the damages resulting therefrom. But if a collision occurs which cannot be attributed to the orders of the train dispatcher, but to the negligence of the defendant's employés, the defendant cannot escape liability. We can add nothing to what has been said upon this subject in the former opinion of this court, and as there is no evidence tending in any degree to show that the collision was caused by any order or omission of the train dispatcher, or was the result of any order or omission growing out of the general control over the track exercised by the Southern Pacific Company, there was, in this aspect of the case, no question for the jury. It was a judicial question and so properly determined by the court.

The material question to be determined is whether there was competent evidence before the jury tending to show that the defendant's servants were negligent in running the train of engines and caboose through the block in which the collision occurred.

It is contended on the part of the defendant that, if the cause of the collision was the running of this train at a high rate of speed and in disregard of all signals of danger, then it was the fault of the en-

gineer in the employ of the Southern Pacific Company in charge of
the Southern Pacific engine in the lead whose negligence caused the
collision; that neither of the engineers in charge of defendant's en-
gines nor the conductor in the employ of the defendant in charge of
the train had any duty to perform with respect to the speed of the
train or the signals of danger displayed by the brakeman of plaintiff's
train in front, or by the semaphore of the block signals showing dan-
ger because of the presence of that train in the block. The defendant,
in support of this contention, introduced in evidence rule 45 of the
block signal system of rules of the Southern Pacific Company, pro-
viding that:

"The signal must be observed by the engineman when the train enters and
by the trainmen when the rear of the train passes out of the block."

The rule refers to the signal displayed by the semaphore under the
system of block signals. Under this rule it is the duty of the engineer
to notice the signal upon entering a block for the purpose of ascer-
taining if the block is clear. If it is clear, he can proceed; but, if it
is not, it is his duty to bring his train to a stop and hold it until the
block is cleared. Upon passing into a block, the forward wheels of
the pony truck of the engine passing over the tracks turns the sema-
phore signal at the entrance of the block to danger, where it remains
until the last two wheels of the last car in the train passing over the
end of the rails at the other end of the block turn the signals back,
showing that the block is clear. This signal showing danger is a
warning to a train in the rear to keep off the block until it shows clear.
In other words, it protects the rear end of the train from collision
from an overtaking train, and it is the duty of the trainmen in the
rear to see that the semaphore signal which has been turned to danger
by the engine of that train stands at danger when the rear of the
train passes that point. But if the engine has passed into a block and
has turned the signal showing that the train is in that block, it ceases
to furnish information of the condition of the block in front of the
train, and the trainmen cannot know its condition, unless, like the
engineer, they had seen the signal before the train entered the block.
This, in case of a very long train, would probably be impracticable for
the conductor in the rear of the train; but it is by no means imprac-
ticable for a conductor having charge of a short train. These sema-
phores are large and conspicuous, and their position can be seen at a
considerable distance. In this case the evidence tends to show that the
semaphore stood at danger before the train, consisting of three engines
and a caboose, entered the block, showing that there was a train al-
ready in the block. This train of engines and caboose was a short
train, and there is no apparent reason why the engineers on the second
and third engines or the conductor seated in the cupola of the caboose
could not have seen the position of the semaphore upon entering the
block, as well as the engineer on the first engine, and been warned
that there was a train in that block. But aside from any duty these
employés of defendant may have had in that respect, the important
fact to be noticed is that, while the Southern Pacific engineer was in
the lead and in charge of the air brakes, defendant's conductor was in

charge of the train. He knew that there was a train ahead of him. The track was crowded with trains. The grade was steep, and the tunnels and curves numerous, requiring such special care and attention on the part of engineers, trainmen, and conductor as was commensurate with the increased danger of such a track. The plaintiff testified that he had observed that there were many duties for trainmen not in the rule book. "One of them," he says, "is a rule that all trainmen of all grades shall be generally watchful as to the safety of trains." This is obviously a necessary rule applicable at all times and places, and particularly on such a track as we have in this case.

Rule 75 of the Book of Rules and Regulations required that "conductors and brakemen of all trains when meeting or passing or leaving or approaching a station must be on the lookout for signals and be prepared to do anything required for safety and dispatch." The evidence shows that this train was approaching and within a half a mile of the station at Bealville when it passed the cautionary signal about 200 or 250 feet east of tunnel No. 4. The conductor in charge of the train testified that this signal was visible from the mouth of tunnel No. 5. If it was yellow it meant to stop. If it was green it meant to go ahead. "The caution is to put the train under complete control. The light, when I saw it, was yellow."

There was evidence that this train was going about 30 miles an hour when it passed this point. The extent and character of the wreckage caused by the collision was itself, under the circumstances, evidence that the train was descending at a dangerous rate of speed, and this of itself was evidence of negligence on the part of the conductor in charge of the train. The conductor says:

"I could have stopped it by opening the conductor's valve in the caboose. That is the method provided so the conductor can stop it. That would have set the brakes and stopped the train."

Why did he not do it? This is his explanation:

"From the time I came within range of vision of this block signal until the time of the collision, I was sitting in the cupola of the caboose with my brakeman. He was on the other side of the cupola. I didn't see that signal until just as it passed by the cupola of the caboose. * * * Just as we came out of tunnel No. 5, I reached out the side window and caught the snow off the front one. There was some snow. It had been storming. It was snowing at this time slightly. I pulled this snow in the window and threw it at my brakeman over on the other side. If there had been any fusees or caution signals on that track burning as I emerged from tunnel No. 5, and if I had been observing, I think I could have seen them. I didn't see the fusee until just as we went by it. After I threw this snow at my brakeman, I turned and looked out of the window, and I see this fusee."

In this state of the evidence, the question whether the defendant's employés were negligent in running this train into collision with the train on which plaintiff was riding, and whether this negligence was a proximate cause of the collision, were clearly questions to be submitted to the jury under proper instructions.

It is next contended that the court erred in refusing to receive and consider certain special instructions on behalf of the defendant; such refusal being based upon the ground that the requested instructions

had not been handed to the court within the time provided in a rule of the court providing that:

"Any special charges or instructions asked for by either party must be presented to the court in writing directly after the close of the evidence and before any argument is made to the jury, or they will not be considered."

The requested instructions were not presented at the close of the evidence, but after the close of the argument and the court was about to instruct the jury. The Circuit Court has power to make such rules regulating its "practice as may be necessary or convenient for the advancement of justice and the prevention of delays in proceedings." Rev. St. § 918 (U. S. Comp. St. 1901, p. 685). The rule requiring instructions to be presented to the court at the close of the evidence and before argument is of that character. It is a general rule and has been found useful in practice. Its enforcement was in the discretion of the court. We do not think the court abused its discretion in enforcing it in this case. The court correctly instructed the jury upon all the matters contained in the special instructions which the jury was properly required to consider. To these instructions no exceptions were taken. The defendant was, therefore, in no way prejudiced by the refusal of the court to give the special instructions in the language requested.

The remaining assignments of error are based in one form or another upon the questions we have already discussed. We do not think they call for further discussion either in relation to the admission or rejection of testimony, or in the instructions to the jury.

The judgment of the court below is affirmed.